# EXHIBIT A-2

Electronically Filed
6/11/2018 11:19 AM
Fourth Judicial District, Ada County
Christopher D. Rich, Clerk of the Court
By: Lori Ferguson, Deputy Clerk

Steven B. Andersen (ISB No. 2618)
sba@aswblaw.com
Jennifer S. Dempsey (ISB No. 7603)
jsd@aswblaw.com
ANDERSEN SCHWARTZMAN
WOODARD BRAILSFORD, PLLC
101 S. Capitol Blvd., Suite 1600
Boise, ID 83702
Telephone:  (208) 342-4411
Facsimile:   (208) 342-4455
*Attorneys for Plaintiffs*

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MICHELLE STIRLING and BRANDON STIRLING, husband and wife, individually and as the natural parents of their minor child, B.S., <br><br> Plaintiffs, <br><br> v. <br><br> NOVARTIS PHARMACEUTICALS CORPORATION, a Delaware Corporation; ALCAMI CAROLINAS CORPORATION fka AAIPHARMA SERVICES CORP., a Delaware Corporation; GENUS LIFESCIENCES INC. dba LEHIGH VALLEY TECHNOLOGIES, a Pennsylvania Corporation; LANNETT COMPANY, INC., a Delaware Corporation; IMPAX LABORATORIES, INC., a Delaware Corporation; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., an Idaho Non-Profit Corporation; GLEN LOVELACE, M.D., an Individual; and DOES INDIVIDUAL/ENTITIES I through XX, <br><br> Defendants. | Case No.  CV01-18-04880 <br><br> **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 1

Michelle Stirling and Brandon Stirling, husband and wife, individually and as the natural guardians and parents of their minor child, B.S., (collectively "Plaintiffs"), by and through their counsel of record, Andersen Schwartzman Woodard Brailsford, PLLC, for their complaint against Defendants, plead and allege as follows:

## THE PARTIES

1.      Plaintiffs are, and at all times relevant hereto were, residents of the County of Ada, State of Idaho, and are the natural parents and guardians of their minor child, B.S., a ten-year-old boy.

2.      Upon information and belief, Defendant Novartis Pharmaceuticals Corporation ("Novartis") is, and at all times relevant hereto was, a Delaware corporation with its principal place of business in East Hanover, New Jersey.  Novartis is, and at all times relevant hereto was, a pharmaceutical company that held or owned the New Drug Application ("NDA") for the brand-name drug, Brethine.  In its capacity as the holder or owner of the Brethine NDA, Novartis developed, manufactured, packaged, labeled, marketed and distributed Brethine until in or about December 2001, when it sold the rights to the Brethine NDA to Defendant Alcami Carolinas Corporation fka aaiPharma Services Corp.

3.      Upon information and belief, Defendant Alcami Carolinas Corporation fka aaiPharma Services Corp. ("Alcami") is, and at all times relevant hereto was, a Delaware corporation with its principal place of business in Wilmington, North Carolina.  Alcami is, and at all times relevant hereto was, a pharmaceutical company that, in or about December 2001, purchased the Brethine NDA from Novartis.  In its capacity as holder or owner of the Brethine NDA, Alcami developed, manufactured, packaged, labeled, marketed and distributed Brethine

until in or about 2007, when it sold the rights to the Brethine NDA to Defendant Genus Lifesciences Inc. dba Lehigh Valley Technologies.

4.     Upon information and belief, Defendant Genus Lifesciences Inc. dba Lehigh Valley Technologies ("Genus") is, and at all times relevant hereto was, a Pennsylvania corporation with its principal place of business in Allentown, Pennsylvania.  Genus is, and at all times relevant hereto was, a pharmaceutical company that, in or about 2007, purchased the Brethine NDA from Alcami.  In its capacity as holder or owner of the Brethine NDA, Genus developed, manufactured, packaged, labeled, marketed and distributed Brethine.  Upon information and belief, Genus also developed, manufactured, packaged, labeled, marketed and distributed Terbutaline Sulfate, the generic version of Brethine.

5.     Upon information and belief, Defendant Lannett Company, Inc. ("Lannett") is, and at all times relevant hereto was, a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  Lannett is, and at all times relevant hereto was, a pharmaceutical company that developed, manufactured, packaged, labeled, marketed and distributed Terbutaline Sulfate, the generic version of Brethine.

6.     Upon information and belief, Defendant Impax Laboratories, Inc. ("Impax") is, and at all times relevant hereto was, a Delaware corporation with its principal place of business in Hayward, California.  Impax is, and at all times relevant hereto was, a pharmaceutical company that developed, manufactured, packaged, labeled, marketed and distributed Terbutaline Sulfate, the generic version of Brethine.

7.     Upon information and belief, Defendant St. Luke's Regional Medical Center, Ltd. ("St. Luke's) is, and at all times relevant hereto was, an Idaho non-profit corporation with its principal place of business in Boise, Idaho.  St. Luke's is, and at all times relevant hereto was, a

health care facility that provided medical services, including obstetrics services, to members of the public, including Plaintiffs.

8.      Upon information and belief, Defendant Glen Lovelace, M.D. ("Lovelace") is, and at all times relevant hereto was, a resident of the County of Ada, State of Idaho and a medical doctor licensed within the State of Idaho. Upon information and belief, Lovelace is, and at all times relevant hereto was, an agent and/or employee of St. Luke's who provided medical services, including obstetrics services, to members of the public, including Plaintiffs, at St. Luke's facilities.

9.      The fictitiously named Doe Defendants in the caption to the Complaint are individuals and entities which, on information and belief, have committed acts or omissions, or have caused events to occur, that have resulted in damages to Plaintiffs. If and when the identities of those individuals and entities are discovered, this Complaint shall be amended accordingly.

10.     Pursuant to Idaho Code § 6-1001, Plaintiffs have filed their required Medical Malpractice Prelitigation Hearing Application and Claim against these two Defendants and the process is complete.

### JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this matter under Idaho Code § 1-705. Defendants are subject to this Court's jurisdiction under Idaho Code § 5-514.

12.     Pursuant to Idaho Code § 5-404, venue is proper in Ada County where Plaintiffs reside, where some of the Defendants reside and where the events which gave rise to Plaintiffs' claims occurred.

13.     Damages in the instant action are expected to be above the limit of this Court to reassign to the Magistrate Division.

### GENERAL FACTUAL ALLEGATIONS

**A.      Facts Regarding the Statutory Scheme Regulating Pharmaceutical Drugs**

14.     The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., prohibits the marketing of a new brand-name drug unless the manufacturer has submitted an NDA and the Food and Drug Administration ("FDA") has approved the drug as safe and effective for its intended use. 21 U.S.C. § 355(a).  The NDA must include a litany of information, including reports of all clinical investigations, relevant nonclinical studies, other data relevant to the drug's safety and effectiveness and an exemplar of the drug's proposed label.  21 U.S.C. § 355(b); 21 C.F.R. § 314.50.  The NDA process is both onerous and lengthy.

15.     Following approval of the NDA, the brand-name holder of that NDA has the exclusive right to manufacture the drug for a specified period of time.  21 U.S.C. § 355(c).  It also assumes the continuing responsibilities under federal law to monitor adverse drug events and new scientific studies and to update the drug label with any necessary warnings.   21 C.F.R. §§ 201.57(c)(6), 314.80.  FDA regulations require the brand-name drug manufacturer to update the warning label "as soon as there is reasonable evidence of an association of a serious hazard with a drug" even when a causal relationship has not been proved.  21 C.F.R. § 201.80(e).  A warning is required under federal law if the drug is commonly prescribed for a disease or condition, even when the drug has not yet been approved for that use, where "such usage is associated with serious risk or hazard."  21 C.F.R. § 201.80(e).  When a change in the warning label is necessary, the drug manufacturer generally must request that change by submitting a "prior approval supplement" to the FDA, who then decides whether to approve the requested change in the warning label.   21 C.F.R. § 314.70(b)(2)(v); FDA, Abbreviated New Drug Application Regulations, 57 Fed.Reg. 17950, 17961 (Apr. 28, 1992).  Under the "changes being effected" regulation, however, a brand-name drug manufacturer may unilaterally update a label, without waiting for FDA preapproval, "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction."  21 C.F.R. § 314.70(c)(6)(iii)(A).  Because these rights and responsibilities attach to the NDA, if the holders

sells the NDA to another company, the safety monitoring and labeling authority and responsibilities for the drug are transferred to the new NDA holder. 21 C.F.R. § 314.72(a)(2).

16.    In 1984, in an effort to make generic versions of name-brand drugs more widely, safely and inexpensively available, Congress passed the Drug Price Competition and Patent Term Restoration Act, also commonly known as the Hatch-Waxman Act. 98 Stat. 1585, 1585-1597, codified as amended at 21 U.S.C. § 355. This statute provides for an expedited, less costly approval process for generic versions of drugs whose name-brand predecessors have already obtained FDA approval. *See* 21 U.S.C. § 355(j). Once the name-brand manufacturer's patent expires, generic manufacturers may enter the market with the benefit of a far more streamlined approval process. Specifically, a generic manufacturer may enter the market by filing an Abbreviated New Drug Application ("ANDA") in which it asserts that the generic drug and the name-brand drug that has already been approved by the FDA (1) are chemically equivalent, meaning the two drugs have the same active ingredient(s), route of administration, dosage form and strength; (2) are bioequivalents, meaning that the two have the same rate and extent of absorption; and (3) have the same label. 21 U.S.C. § 355(j); 21 C.F.R. § 320.1(c). Thus, although the ANDA approach enables generic manufacturers to enter the market without the need to do timely and expensive testing and submissions, using this approach requires that the generic drug's design and warning label identically match that of the name-brand version of the drug in all material respects. 21 U.S.C. § 355(j).

17.    Once an NDA or ANDA has been approved, the manufacturer, whether name-brand or generic, is prohibited from making any material changes to the drug's design. 21 C.F.R. § 314.70(b). Additionally, unlike a name-brand manufacturer who can unilaterally change the drug's warning label, *see* 21 C.F.R. § 314.70(c)(6)(iii)(A), a generic manufacturer is prohibited

from doing so and, instead, must always ensure that its label is identical to that of the brand-name manufacturer.  21 U.S.C. § 355(j)(2); *see* 21 C.F.R. §§ 314.94(a)(8)(iii), 314.150(b)(10).

18.     Under this federal statutory scheme, it is foreseeable and even expected that, once a brand-name drug's patent protection for a drug has expired, other manufacturers will begin producing generic versions of the drug and that consumers in the market for the brand-name drug will begin purchasing the generic versions.  Moreover, it is well understood and established that any generic manufacturer is required by law to use the brand-name manufacturer's design and warning label, and that any defects that were discovered later in the drug's design or label could only be cured by the brand-name manufacturer.  Thus, under such circumstances, any problem with the brand-name drug's design or warning label will impact the brand-name version and any generic version equally.  As such, it is foreseeable that any negligence on the part of the brand-name manufacturer with respect to the drug's design or warning label could result in injury to a consumer ingesting a subsequent generic version of the drug.

### B.      Facts Regarding Brethine, Terbutaline Sulfate and Their Manufacturers

19.     Terbutaline Sulfate is a beta-2 adrenergic agonist that acts upon the beta2 receptors in smooth muscle tissue and causes muscles to relax.  The drug was originally developed by Draco, a Swedish company, and released for use as a bronchodilator to treat asthma.  In 1974, the FDA approved Terbutaline Sulfate as a treatment for asthma in the United States and, at all times relevant hereto, Terbutaline Sulfate was available in both oral tablet and injectable formulations.

20.     In 1976, a Swedish physician with ties to Draco published the results of a small study indicating that Terbutaline Sulfate was safe and effective as a tocolytic – a drug to suppress premature labor in pregnant women – on the theory that the drug could relax uterine muscle tissue. Thereafter, Terbutaline Sulfate gained wide acceptance as a tocolytic and, in fact, by 2001, nearly half of all prescriptions for the brand-name or generic versions of the drug were for tocolysis.

Despite this fact, no brand-name or generic manufacturer of the drug has ever sought FDA approval for this off-label use.

21.     Contrary to the 1976 Swedish study, numerous subsequent studies cast significant doubt on the safety and efficacy of Terbutaline Sulfate as a tocolytic.  In fact, beginning in 1978, a plethora of scientific studies and their corresponding published reports indicated not only that Terbutaline Sulfate was not an effective tocolytic but, more importantly, that its use as such had significant adverse effects on both the mother and the unborn fetus.  Specifically, with respect to the fetus, studies showed that the drug could cross the placenta and fetal brain barrier in sufficient quantities to adversely affect brain development.  These adverse effects included, but were not limited to, higher rates of psychiatric disorders and psychopathology and decreased cognitive development.

22.     Terbutaline Sulfate was originally marketed under the brand names Brethine and Bricanyl.[1]  Novartis owned the NDA for Brethine until in or about December 2001 when it sold the rights to Alcami.  Despite the scientific studies discussed above, at no time during Novartis' ownership of the Brethine NDA, including at the time it sold the rights to that NDA to Alcami, did Novartis' label for Brethine contain any warning that use of the drug as a tocolytic posed a risk to fetal brain development, even though the label allowed for administration for pre-term labor.

23.     Alcami owned the Brethine NDA from in or about December 2001 to sometime in or about 2007 when it sold the rights to Genus.  Despite the scientific studies discussed above, at no time during Alcami's ownership of the Brethine NDA, including at the time it sold the rights to that NDA to Genus, did Alcami's label for Brethine contain any warning that use of the drug as a tocolytic posed a risk to fetal brain development, even though the label allowed for administration for pre-term labor.

---

[1] Approval for the Bricanyl products was withdrawn in 2007 at the sponsor's request.

24.     Genus owned the Brethine NDA from in or about 2007 through at least February 2011. Despite the scientific studies discussed above, at no time in 2007 or through February 18, 2008, when Genus owned the Brethine NDA, did Genus' label for Brethine contain any warning that use of the drug as a tocolytic posed a risk to fetal brain development, even though the label allowed for administration for pre-term labor.

25.     Upon information and belief, in late 2007 and early 2008, at least three companies, including Genus, Lannett and Impax, owned an ANDA, under which they were each permitted to develop, manufacture, package, label, market and distribute Terbutaline Sulfate, the generic version of Brethine. At no time in late 2007 or early 2008 did the labels for these companies' respective Terbutaline Sulfate drugs contain any warning that use of the drug as a tocolytic posed a risk to fetal brain development, even though the labels allowed for administration for pre-term labor.

26.     Despite the scientific studies discussed above, which not only indicated that neither Brethine nor Terbutaline Sulfate was effective as a tocolytic, but also that such use posed a risk to fetal brain development, Defendants continued to manufacture, market and distribute the drugs with the intention that they be used as a tocolytic by improperly promoting them as safe and effective for that use. Defendants did so even though, based upon the scientific studies, they knew or should have known that this was not true.

**C.      Facts Regarding Plaintiffs' Ingestion of Terbutaline Sulfate**

27.     In late October 2007, Plaintiff Michelle Stirling was approximately twenty-five (25) weeks pregnant with her now ten-year-old son, B.S. On October 26, 2007, Plaintiff Michelle Stirling was admitted to St. Luke's hospital in downtown Boise, Idaho for contractions, cramping and abdominal pain. While there, she was given a subcutaneous injection of Terbutaline Suflate at Lovelace's direction. Thereafter, St. Luke's and its agents and/or employees, including

Lovelace, repeatedly prescribed oral tablets of Terbutaline Sulfate as a tocolytic to Plaintiff Michelle Stirling, to be taken every four (4) to six (6) hours. The cumulative effect of these myriad prescriptions was that Plaintiff Michelle Stirling took Terbutaline Sulfate as prescribed every four (4) to six (6) hours for over 90 consecutive days.

28.     At no time prior to or during the period of time that Plaintiff Michelle Stirling was prescribed Terbutaline Sulfate to prevent preterm labor of her pregnancy with B.S. was she or Plaintiff Brandon Stirling warned by any party, including Lovelace or any other agent and/or employee of St. Luke's, that the ingestion of the drug could potentially have adverse effects on B.S.'s brain development or his cognitive and neuropsychiatric condition. Similarly, none of the labels on the bottles of Terbutaline Sulfate that Plaintiffs filled pursuant to the prescriptions written by St. Luke's and its agents and/or employees, including Lovelace, had warnings about possible adverse side effects to their developing fetus, nor were those bottles accompanied by any such written warnings.

29.     Plaintiffs' minor son, B.S., was born on February 18, 2008.

30.     As an infant and small child, B.S. did not have any objective manifestations that would have indicated or did indicate to Plaintiffs or the health care practitioners who treated B.S. that he had any cognitive or neuropsychiatric impairments or disorders. On or about September 12, 2014, B.S. was diagnosed with anxiety disorder and oppositional defiant disorder. Thereafter, on or about October 8, 2014, B.S. was also diagnosed with DMDD, or disruptive mood dysregulation disorder.

31.     Approximately two years later, on or about August 24, 2016, B.S. was diagnosed with the following: (1) bipolar disorder; (2) separation anxiety disorder; and (3) social anxiety disorder of childhood. Days later he underwent a psychological evaluation, at which time Plaintiffs were told that B.S.'s ADOS-2 score was suggestive of an Autism Spectrum Disorder of

moderate severity.  On September 6, 2016, B.S. was diagnosed with a Bipolar Disorder and Autism Spectrum Disorder.

32.     As a result of B.S.'s diagnoses, Plaintiffs have been forced to incur economic damages, and B.S. shall be forced to incur upon obtaining the age of majority, including but not limited to, the costs associated with B.S.'s prior and future medical treatment, prescription medications, therapy, caregivers, education and vocational training.  In addition, Plaintiffs have lost wages associated with the time needed to properly treat and take care of B.S.  Finally, Plaintiffs have lost the protection, comfort, society and companionship of B.S. and Plaintiffs, including B.S., have suffered emotional distress and pain and suffering as a result of Defendants' unlawful conduct.

## CLAIMS FOR RELIEF

### COUNT I – NEGLIGENT FAILURE TO WARN
### (DEFENDANTS NOVARTIS, ALCAMI, GENUS AND DOES I-X "Brand-Name Manufacturer Defendants")

33.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

34.     At all times relevant hereto, Novartis, Alcami, Genus and Does I-X (collectively the "Brand-Name Manufacturer Defendants") were holders of the NDA for the brand-name drug, Brethine, and, as such, were engaged in the business of developing, manufacturing, packaging, labeling, marketing and distributing Brethine.

35.     At all times relevant hereto, the Brand-Name Manufacturer Defendants each had a duty to exercise reasonable and ordinary care, and to comply with the existing standards of care, in their development, manufacturing, packaging, labeling, marketing and distribution of Brethine. This duty to exercise reasonable and ordinary care and to comply with the existing standards of care includes, but is not limited to, a duty to (1) monitor adverse drug events involving Brethine

and keep abreast of scientific studies regarding Brethine, including the efficacy, or lack thereof, of its use as a tocolytic and the risk Brethine posed to fetal brain development; and (2) timely update Brethine's label and warn physicians and consumers of the risk Brethine posed to fetal brain development.

36.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that the Brethine they developed, manufactured, packaged, labeled, marketed and distributed was defective and unreasonably dangerous to the developing brains of fetuses of pregnant women who were administered and/or who ingested it as a tocolytic.

37.     At all times relevant hereto, the Brand-Name Manufacturer Defendants deviated from the standard of care and breached the above-identified duties of care through their actions and omissions, including but not limited to the following:

   a. By failing to monitor adverse drug events involving Brethine and keep abreast of scientific studies regarding Brethine, including the efficacy, or lack thereof, of its use as a tocolytic and the risk Brethine posed to fetal brain development;

   b. By failing to timely update Brethine's label and warn physicians and consumers of the risk Brethine posed to fetal brain development; and

   c. By continuing to manufacture, market and distribute Brethine with the intention that it be used as a tocolytic.

38.     At all times relevant hereto, the Brand-Name Manufacturer Defendants placed the Brethine they developed, manufactured, packaged, labeled, marketed and distributed into the stream of commerce, including within Idaho, in a defective and unreasonably dangerous and unsafe condition.  The Brethine that the Brand-Name Manufacturer Defendants placed into the stream of commerce was defective and unreasonably dangerous and unsafe when it left said

Defendants' control in that its label failed to warn or alert physicians and consumers to the risk

Brethine posed to fetal brain development, a risk that the Brand-Name Manufacturer Defendants

knew about or reasonably should have known about based upon the numerous scientific studies

that had been conducted and results that had been published indicating such a risk.

39.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or

reasonably should have known that any Brand-Name Manufacturer Defendant who subsequently

purchased the NDA rights to Brethine from them would not change or update Brethine's defective

and deficient label.

40.     At all times relevant hereto, the Brand-Name Manufacturer Defendants also knew

or reasonably should have known that manufacturers of Terbutaline Sulfate, the generic version of

Brethine, were required under federal law to ensure all of the following: (1) that the Terbutaline

Sulfate was chemically equivalent to Brethine; (2) that the Terbutaline Sulfate was the

"bioequivalent" of Brethine; and (3) that the label for Terbutaline Sulfate was the same as the label

for Brethine.  Thus, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew

or reasonably should have known that, if they failed to include adequate warnings on their Brethine

labels alerting physicians and consumers to the risk Brethine posed to fetal brain development, the

manufacturers of Terbutaline Sulfate were compelled by federal law to include that defective and

deficient label on the Terbutaline Sulfate products.

41.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or

reasonably should have known that physicians routinely rely upon information provided by the

brand-name manufacturers of drugs.

42.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or

reasonably should have known that due to any number of reasons, including health insurance

limitations and/or the discretion of doctors or pharmacists, a pregnant woman's prescription for

Brethine may be filled with the generic version, Terbutaline Sulfate, or she may originally be prescribed that generic version instead of Brethine.  Moreover, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that there were a number of different generic versions of Brethine and that the physician prescriber usually will not know which generic version, if any, will be dispensed by the pharmacy.

43.     In reliance on the Brand-Name Manufacturer Defendants' defective and deficient warning label as described above, and as a direct and proximate result thereof, Plaintiff Michelle Stirling was prescribed Brethine's generic version, Terbutaline Sulfate, for use as a tocolytic for a period of more than 90 consecutive days.

44.     Upon information and belief, Plaintiff Michelle Stirling would not have been prescribed Brethine's generic version, Terbutaline Sulfate, had the Brand-Name Manufacturer Defendants' warning label alerted physicians to the risk Brethine and, in turn, its identical generic version, Terbutaline Sulfate, posed to fetal brain development, nor would Plaintiff Michelle Stirling have taken it had she known of that risk.

45.     Plaintiffs have suffered actual injuries and damages as described herein, all of which were the reasonably foreseeable results of the Brand-Name Manufacturer Defendants' negligent acts and omissions.

46.     Plaintiffs' injuries and damages are and were a direct and proximate result of the Brand-Name Manufacturer Defendants' negligence, gross negligence, recklessness and/or failure to use the requisite due care.

47.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

### COUNT II – FRAUD
**(DEFENDANTS NOVARTIS, ALCAMI, GENUS, LANNETT, IMPAX AND DOES I-XX**
**"Manufacturer Defendants")**

48.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

49.     At all times relevant hereto, Defendants Novartis, Alcami, Genus, Lannett, Impax and Does I-XX (collectively the "Manufacturer Defendants") manufactured, marketed and distributed Brethine and/or its generic bioequivalent, Terbutaline Sulfate, with the intention that it be used in the off-label manner as a tocolytic by improperly promoting those drugs as safe and effective for that particular use.

50.     Based upon the multiple scientific studies and published reports dating back to 1978 as discussed herein, the Manufacturer Defendants knew or reasonably should have known not only that Brethine and Terbutaline Sulfate were not effective tocolytics, but also that their use in such an off-label manner was not safe and, instead, posed significant risks to the pregnant woman and her developing fetus.

51.     The Manufacturer Defendants' promotion, marketing and distribution of Brethine and Terbutaline Sulfate as a safe and effective tocolytic, which was contrary to the scientific studies and published reports, was material to Plaintiff Michell Stirling being prescribed Terbutaline Sulfate for that very purpose.

52.     The Manufacturer Defendants intended to induce physicians and consumers to prescribe and/or ingest Brethine and/or Terbutaline Sulfate by making them believe and trust that the drugs were safe and effective.

53.     The Manufacturer Defendants knew or reasonably should have known that physicians rely upon drug manufacturers to provide them with sufficient warnings about the potential adverse side effects of drugs and that, if there is an update or change on potential adverse side effects or risks, they will be notified.

54. The Manufacturer Defendants knew or reasonably should have known that consumers rely upon (1) drug manufacturers to provide sufficient warning labels on their medications that adequately warn them of the potential adverse side effects of the drugs they are prescribed; and/or (2) the expertise and knowledge of their physicians to notify them of those potential adverse side effects.

55. Upon information and belief, Plaintiffs and their health care providers were ignorant of the fact that the Manufacturer Defendants' representations that Brethine and its generic bioequivalent, Terbutaline Sulfate, were effective and safe when used as a tocolytic were false.

56. Plaintiffs and their health care providers justifiably relied upon the Manufacturer Defendants' expertise and justifiably believed that (1) the Manufacturer Defendants would monitor adverse drug events involving Brethine and Terbutaline Sulfate; (2) keep abreast of scientific studies regarding those drugs; (3) timely update their respective labels to adequately and sufficiently warn physicians and consumers of the risk Brethine posed to fetal brain development; and (4) not promote a drug for an off-label use that had been shown to be ineffective and dangerous. As such, Plaintiffs and their health care providers justifiably relied upon the Manufactuer Defendants' false statement that Brethine and Terbutaline Sulfate were safe and effective for use as a tocolytic.

57. Based upon this justifiable reliance, Plaintiffs' health care providers prescribed Terbutaline Sulfate to Plaintiff Michelle Stirling as a tocolytic to be taken for over 90 consecutive days. Additionally, based upon this justifiable reliance, Plaintiff Michelle Stirling ingested the Terbutaline Sulfate as prescribed.

58. Plaintiffs have suffered actual injuries and damages as described herein, all of which were a direct and proximate result of the Manufacturer Defendants' fraudulent statements.

59.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

## COUNT III – NEGLIGENCE *PER SE*
## (DEFENDANTS NOVARTIS, ALCAMI, GENUS AND DOES I-X "Brand-Name Manufacturer Defendants")

60.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

61.     Under the FDCA, a drug is misbranded "[i]f its labeling is false or misleading in any particular."   21 U.S.C. § 352(a).   Similarly, the Idaho Food, Drug and Cosmetic Act ("IFDCA") prohibits both the "manufacture, sale, or delivery, holding or offering for sale of any…drug…that is…misbranded," as well as the "misbranding of any…drug…."  I.C. § 37-115(a), (b).   Under the IFDCA, a drug is misbranded if its labeling or advertising is false or misleading, including if such labeling or advertising fails to reveal facts material to the consequences that may result from the use of the drug under the conditions for use prescribed in the labeling or advertising or under such conditions of use as are customary and usual.  I.C. § 37-114(k).

62.     At all times relevant hereto, the Brand-Name Manufacturer Defendants were holders of the NDA for the brand-name drug, Brethine, and, as such, were engaged in the business of developing, manufacturing, packaging, labeling, marketing and distributing Brethine.

63.     At all times relevant hereto, the Brand-Name Manufacturer Defendants' Brethine drug products were misbranded under both the FDCA and the IFDCA in that their labeling promoted the use of Brethine as a tocolytic but failed to include any warning of the known risks to fetal brain development associated with such use.

64.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that any Brand-Name Manufacturer Defendant who subsequently

purchased the NDA rights to Brethine from them would not change or update Brethine's defective and deficient label that, under the applicable standards, rendered the drug misbranded.

65.     At all times relevant hereto, the Brand-Name Manufacturer Defendants also knew or reasonably should have known that manufacturers of Terbutaline Sulfate, the generic version of Brethine, were required under federal law to ensure all of the following: (1) that the Terbutaline Sulfate was chemically equivalent to Brethine; (2) that the Terbutaline Sulfate was the "bioequivalent" of Brethine; and (3) that the label for Terbutaline Sulfate was the same as the label for Brethine.  Thus, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that, if they failed to include adequate warnings on their Brethine labels alerting physicians and consumers to the risk Brethine posed to fetal brain development, the manufacturers of Terbutaline Sulfate were compelled by federal law to include that defective and deficient label on the Terbutaline Sulfate products, thereby resulting in the Terbutaline Sulfate being misbranded.

66.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that physicians routinely rely upon information provided by the brand-name manufacturers of drugs.

67.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that due to any number of reasons, including but not limited to health insurance limitations and/or the discretion of doctors or pharmacists, a pregnant woman's prescription for Brethine may be filled with the generic version, Terbutaline Sulfate, or she may originally be prescribed that generic version instead of Brethine.  Moreover, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that there were a number of different generic versions of Brethine and that the physician prescriber usually will not know which generic version, if any, will be dispensed by the pharmacy.

68.     In reliance on the Brand-Name Manufacturer Defendants' defective and deficient warning label and, in turn, their misbranded drug as described above, and as a direct and proximate result thereof, Plaintiff Michelle Stirling was prescribed Brethine's generic version, Terbutaline Sulfate, for use as a tocolytic for a period of more than 90 consecutive days.

69.     Upon information and belief, Plaintiff Michelle Stirling would not have been prescribed Brethine's generic version, Terbutaline Sulfate, had the Brand-Name Manufacturer Defendants' warning label alerted physicians to the risk Brethine and, in turn, its identical generic version, Terbutaline Sulfate, posed to fetal brain development, nor would Plaintiff Michelle Stirling have taken it had she known of that risk.

70.     Plaintiffs have suffered actual injuries and damages as described herein, all of which were a direct and proximate result of the Brand-Name Manufacturer Defendants' misbranding of their drugs in violation of the above laws.

71.     The above laws are intended to prevent the type of harm that the Brand-Name Manufacturer Defendants' statutory breaches caused.

72.     Plaintiffs are members of the class of persons the above statutory provisions are designed to protect.

73.     Plaintiffs' injuries and damages are and were a direct and proximate result of the Brand-Name Manufacturer Defendants' negligence, gross negligence, recklessness and/or failure to use the requisite due care in violation of these laws.  Said behavior constitutes negligence *per se*.

74.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

## COUNT IV – BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (DEFENDANTS NOVARTIS, ALCAMI, GENUS AND DOES I-X "Brand-Name Manufacturer Defendants")

75.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

76.     At all times relevant hereto, the Brand-Name Manufacturer Defendants were holders of the NDA for the brand-name drug, Brethine, and, as such, were engaged in the business of developing, manufacturing, packaging, labeling, marketing and distributing Brethine.

77.     Under federal law, once the NDA for Brethine was approved, under which the Brand-Name Manufacturer Defendants developed, manufactured, packaged, labeled, marketed and distributed Brethine, the Brand-Name Manufacturer Defendants could not make any material changes to the design of the Brethine.  21 C.F.R. § 314.70(b).  They could, however, and were required to update the labeling for Brethine to include additional warnings "as soon as there is reasonable evidence of an association of a serious hazard with a drug" even when a causal relationship has not been proved.  21 C.F.R. § 201.80(e).  Such a label change to include additional warnings is required if the drug is commonly prescribed for a disease or condition, even when the drug has not yet been approved for that use, where "such usage is associated with serious risk or hazard."  21 C.F.R. § 201.80(e).

78.     At all times relevant hereto, the Brand-Name Manufacturer Defendants' labeling for Brethine was defective and deficient in that it promoted and/or approved of the use of the drug as a tocolytic but failed to warn of the known serious risks to fetal brain development associated with such use.

79.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that any Brand-Name Manufacturer Defendant who subsequently purchased the NDA rights to Brethine from them would not change or update Brethine's defective and deficient label.

80.     At all times relevant hereto, the Brand-Name Manufacturer Defendants also knew or reasonably should have known that manufacturers of Terbutaline Sulfate, the generic version of Brethine, were required under federal law to ensure all of the following: (1) that the Terbutaline Sulfate was chemically equivalent to Brethine; (2) that the Terbutaline Sulfate was the "bioequivalent" of Brethine; and (3) that the label for Terbutaline Sulfate was the same as the label for Brethine.  Thus, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that, if they failed to include adequate warnings on their Brethine labels alerting physicians and consumers to the risk Brethine posed to fetal brain development, the manufacturers of Terbutaline Sulfate were compelled by federal law to include that defective and deficient label on the Terbutaline Sulfate products.

81.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that physicians routinely rely upon information provided by the brand-name manufacturers of drugs.

82.     At all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that due to any number of reasons, including health insurance limitations and/or the discretion of doctors or pharmacists, a pregnant woman's prescription for Brethine may be filled with the generic version, Terbutaline Sulfate, or she may originally be prescribed that generic version instead of Brethine.  Moreover, at all times relevant hereto, the Brand-Name Manufacturer Defendants knew or reasonably should have known that there were a number of different generic versions of Brethine and that the physician prescriber usually will not know which generic version, if any, will be dispensed by the pharmacy.

83.     In reliance on the Brand-Name Manufacturer Defendants' defective and deficient warning label as described above, and as a direct and proximate result thereof, Plaintiff Michelle Stirling was prescribed Brethine's generic version, Terbutaline Sulfate, for use as a tocolytic for a

period of more than 90 consecutive days. Consistent with those prescriptions, Plaintiff Michelle Stirling purchased and ingested Brethine's generic version, Terbutaline Sulfate, as prescribed.

84.     Upon information and belief, Plaintiff Michelle Stirling would not have been prescribed Brethine's generic version, Terbutaline Sulfate, had the Brand-Name Manufacturer Defendants' warning label alerted physicians to the risk Brethine and, in turn, its identical generic version, Terbutaline Sulfate, posed to fetal brain development, nor would Plaintiff Michelle Stirling have purchased or taken it had she known of that risk.

85.     The Terbutaline Sulfate that Plaintiff Michelle Stirling was prescribed, purchased and ingested was not fit for safe use as a tocolytic, a common purpose or use for which the Brand-Name Manufacturer Defendants manufactured, marketed and distributed their Brethine drugs and, in turn, a purpose or use for which its generic version, Terbutaline Sulfate, was intended and commonly used. Additionally, the Terbutaline Sulfate prescribed to, purchased by and ingested by Plaintiff Michelle Stirling was not adequately labeled in that it failed to warn of the known significant risks to fetal brain development associated with the use of the drug as a tocolytic.

86.     This defective, deficient and inadequate labeling was a direct result of the Brand-Name Manufacturer Defendants' failure to comply with federal law and properly update their Brethine labels to include the known risks to fetal brain development associated with use of their drug (and the generic versions of their drug) for use as a tocolytic since, under that law, manufacturers of Terbutaline Sulfate, Brethine's generic version, were required to ensure that their labels were identical to those of the Brand-Name Manufacturer Defendants.

87.     Plaintiffs have suffered actual injuries and damages as described herein, all of which were a direct and proximate result of the Brand-Name Manufacturer Defendants' deficient and defective labeling and corresponding breach of the warranty of merchantability.

88.     Plaintiffs' injuries and damages are and were a direct and proximate result of the Brand-Name Manufacturer Defendants' negligence, gross negligence, recklessness and/or breach of the warranty of merchantability.

89.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

### COUNT V – MEDICAL MALPRACTICE
### (DEFENDANTS ST. LUKE'S AND LOVELACE "Medical Care Defendants")

90.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

91.     At all times relevant hereto, a patient-provider relationship existed between Plaintiff Michelle Stirling, on the one hand, and St. Luke's and its agent and/or employee Lovelace, on the other hand (collectively the "Medical Care Defendants").

92.     At all times relevant hereto, the Medical Care Defendants violated the standard of care applicable to the provision of obstetrical care in the region.

93.     For example, despite the fact that numerous scientific studies and their corresponding published reports indicated prior to October 2007 that Terbutaline Sulfate was not an effective tocolytic and that its use as such had significant adverse effects on the mother and the brain development of the unborn fetus, the Medical Care Defendants prescribed Terbutaline Sulfate to Plaintiff Michelle Stirling for a period of more than 90 consecutive days, beginning on October 26, 2007.  The Medical Care Defendants negligently prescribed Terbutaline Sulfate to Plaintiff Michelle Stirling in this fashion despite the fact that on November 2, 2007 and November 30, 2007, Plaintiff Michelle Stirling had a negative fetal fibronectin exam, thereby indicating that she was highly unlikely to go into labor within the subsequent two weeks.

94.     The Medical Care Defendants' prescription and administration of Terbutaline Sulfate to Plaintiff Michelle Stirling despite her negative fetal fibronectin exams and the published

studies disclosing the significant risks associated with the use of Terbutaline Sulfate as a tocolytic and its lack of efficacy for such use fell below the standard of care in the region during the 2007/2008 time period.

95.     As a direct and proximate result of the Medical Care Defendants' negligent prescription and administration of Terbutaline Sulfate to Plaintiff Michelle Stirling, her and Plaintiff Brandon Stirling's son, B.S., who was in utero at the time of Plaintiff Michelle Stirling's ingestion of the Terbutaline Sulfate, developed significant cognitive and neuropsychiatric impairments and/or disorders.  These impairments and/or disorders include anxiety disorder, oppositional defiant disorder, disruptive mood dysregulation disorder, bipolar disorder, separation anxiety disorder, social anxiety disorder and autism spectrum disorder.

96.     As a result of B.S.'s diagnoses, Plaintiffs have been forced to incur economic damages, and B.S. shall be forced to incur upon obtaining the age of majority, including but not limited to, the costs associated with B.S.'s prior and future medical treatment, prescription medications, therapy, caregivers, education and vocational training.  In addition, Plaintiffs have lost wages associated with the time needed to properly treat and take care of B.S.  Finally, Plaintiffs have lost the protection, comfort, society and companionship of B.S. and Plaintiffs, including B.S., have suffered emotional distress and pain and suffering as a result of Defendants' unlawful conduct.

97.     As described above, Plaintiffs have suffered actual injuries and damages, all of which were a direct and proximate result of the Medical Care Defendants' professional negligence.

98.     Plaintiffs' injuries and damages are and were a direct and proximate result of the Medical Care Defendants' negligence, gross negligence and recklessness.

99.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

100.    Prior to filing the instant civil lawsuit against the Medical Care Defendants, Plaintiffs satisfied all pre-litigation review screening requirements by filing a Medical Malpractice Prelitigation Hearing Application and Claim with the Idaho Board of Medicine, attending the subject prelitigation hearing and being issued an opinion by the panel.

### COUNT VI – FAILURE TO OBTAIN INFORMED CONSENT
### (DEFENDANTS ST. LUKE'S AND LOVELACE "Medical Care Defendants")

101.    Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

102.    At all times relevant hereto, a patient-provider relationship existed between Plaintiff Michelle Stirling, on the one hand, and the Medical Care Defendants, on the other hand.

103.    At all times relevant hereto, the Medical Care Defendants violated the standard of care applicable to the provision of obstetrical care in the region.

104.    For example, prior to October 2007, numerous scientific studies and their corresponding published reports indicated that Terbutaline Sulfate was not an effective tocolytic and that its use as such had significant adverse effects on the mother and the brain development of the unborn fetus.  Despite these publications and the Medical Care Defendants' prescription of Terbutaline Sulfate to Plaintiff Michelle Stirling as a tocolytic for a period of more than 90 consecutive days, the Medical Care Defendants failed to disclose the pertinent facts to Plaintiffs so that they were sufficiently aware of the need for, the nature of and the significant risks ordinarily involved in such treatment so as to enable them to make a reasonably informed decision on whether to undergo the subject treatment or reject it.  These pertinent facts include, but are not limited to, the fact that studies had shown that Terbutaline Sulfate was not an effective tocolytic, that its use as such was associated with significant risks to the mother and the unborn fetus, including higher rates of psychiatric disorders and psychopathology and decreased cognitive development, and that

there were alternatives for treating Plaintiff Michelle Stirling's pre-term labor that did not have such risks.

105.    A physician of good standing practicing in the region during the 2007/2008 time period would have disclosed these pertinent facts to Plaintiffs prior to administering Terbutaline Sulfate to Plaintiff Michelle Stirling so as to provide them with the ability to make an informed decision on the treatment.

106.    Had Plaintiffs been adequately informed by the Medical Care Defendants, they would have chosen a different course of treatment as a reasonable person in their shoes would have done as well.

107.    As a direct and proximate result of the Medical Care Defendants' failure to adequately inform Plaintiffs of the risks associated with and the alternatives to treating Plaintiff Michelle Stirling's pre-term labor with Terbutaline Sulfate, Plaintiffs agreed to such treatment. As a direct and proximate result of that treatment, Plaintiffs' son, B.S., who was in utero at the time of Plaintiff Michelle Stirling's ingestion of the Terbutaline Sulfate, developed the cognitive and neuropsychiatric disorders that the previously published scientific studies had identified as being associated with the use of Terbutaline Sulfate as a tocolytic.

108.    As a result of B.S.'s diagnoses, Plaintiffs have been forced to incur economic damages, and B.S. shall be forced to incur upon obtaining the age of majority, including but not limited to, the costs associated with B.S.'s prior and future medical treatment, prescription medications, therapy, caregivers, education and vocational training. In addition, Plaintiffs have lost wages associated with the time needed to properly treat and take care of B.S. Finally, Plaintiffs have lost the protection, comfort, society and companionship of B.S. and Plaintiffs, including B.S., have suffered emotional distress and pain and suffering as a result of Defendants' unlawful conduct.

109.     As described above, Plaintiffs have suffered actual injuries and damages, all of which were a direct and proximate result of the Medical Care Defendants' failure to obtain Plaintiffs' informed consent.

110.     Plaintiffs' injuries and damages are and were a direct and proximate result of the Medical Care Defendants' failure to obtain Plaintiffs' informed consent.

111.     Plaintiffs are, therefore, entitled to recover damages in an amount to be proven at trial.

112.     Prior to filing the instant civil lawsuit against the Medical Care Defendants, Plaintiffs satisfied all pre-litigation review screening requirements by filing a Medical Malpractice Prelitigation Hearing Application and Claim with the Idaho Board of Medicine, attending the subject prelitigation hearing and being issued an opinion by the panel.

### COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

113.     Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

114.     The conduct of Defendants, as stated in the above allegations of this Complaint, was intentional and/or reckless.

115.     Such conduct was extreme and outrageous.

116.     As a proximate cause of such wrongful conduct, Plaintiffs have suffered extreme emotional distress.

117.     Plaintiffs are, therefore, entitled to recover damages for intentional infliction of emotional distress in amounts to be proven at trial.

## COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

118.    Plaintiffs re-allege the allegations in each paragraph above and incorporate them herein by reference as though set forth in full.

119.    Defendants had a duty to exercise ordinary care to prevent unreasonable, foreseeable risks of harm to others, including Plaintiffs.

120.    Defendants breached those duties through their actions and inactions as described herein.

121.    As a proximate result of the breach of that duty, Plaintiffs have suffered emotional injuries as well as physical manifestations of those emotional injuries.

122.    Plaintiffs are, therefore, entitled to recover damages for negligent infliction of emotional distress in amounts to be proven at trial.

### COSTS AND ATTORNEY'S FEES

123.    Plaintiffs have been required to obtain the assistance of counsel to assist in the prosecution of this matter.  Plaintiffs are entitled to recover their reasonable costs and attorney's fees incurred in the prosecution of this matter pursuant to applicable law.

### DEMAND FOR JURY TRIAL

124.    Plaintiffs hereby demand a jury trial pursuant to Rule 38(b) of the Idaho Rules of Civil Procedure.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1.    For all economic and non-economic damages sustained by Plaintiffs as a result of Defendants' conduct in an amount to be determined at trial;

2.    For damages in excess of any statutory limitation in an amount to be determined at trial for Defendants' conscious, willful, wanton and reckless conduct;

3.    For all costs and attorney's fees incurred in prosecution of this action pursuant to Rule 54 of the Idaho Rules of Civil Procedure, Idaho Code §§ 12-120 and 12-121 and other applicable law; and

4.    For such other and further relief as the Court deems just and proper.

DATED this 11th day of June, 2018.

ANDERSEN SCHWARTZMAN
WOODARD BRAILSFORD, PLLC


/s/ Jennifer S. Dempsey
Jennifer S. Dempsey
Attorneys for Plaintiffs